# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 08cr3366 JM |
| Plaintiff, | ORDER GRANTING MOTION TO SUPPRESS STATEMENTS |
| vs. | |
| BRADLEY JOHN DIERKING, | |
| Defendant. | |

Defendant Bradley John Dierking ("Defendant") moves to suppress statements, challenging the failure of law enforcement agents to provide Miranda advisements at any time during the February 8, 2008 interrogation at issue. The Government opposes the motion. Having carefully considered the moving papers, the record before the court, appropriate authorities, and the evidence submitted at the time of the evidentiary hearing, the court grants the motion to suppress statements.

## BACKGROUND

On October 2, 2008 Defendant was indicted for Intentionally Causing Damage to a Protected Computer in violation of 18U.S.C.§1030(a)(5)(A)(I). The indictment alleges that Defendant was employed as the Lead Programmer for Geary Interactive from May 15, 2005 until April 30, 2007. Geary is an online advertising company whose largest client was Miraval Resort, a luxury resort in Arizona. As part of his responsibilities, Defendant had access to all of Geary's computer systems and databases. (Indictment ¶3). His responsibilities included designing and programming websites and data bases, including controlling access to "back-end databases through the assignment of usernames

1  and passwords." Id. ¶4.

2  Defendant's employment with Geary terminated on April 30, 2007. He then went to work for
3  Castle Advertising, an advertising partner with Geary in which Castle handled traditional advertising
4  and Geary handled the online advertising for their shared clients, including Miraval. Between May
5  14, 2007 and June 13, 2007 Defendant allegedly accessed Geary's computer systems and defaced the
6  online reservations page of the Miraval Resort website hosted by Geary. On June 7, Geary was
7  notified by Miraval of an unauthorized change made to its reservations page. The reservations page
8  read " [Geary's CEO] IS A HOMOSEXUAL" and its '[Strategic Planning Director] IS A STUPID
9  FUCKING JEW."   Miraval subsequently terminated its relationship with Geary.

10  The issues raised in the present motion concern the execution of a search warrant for the
11  seizure of, among other things, computer related items at Defendant's apartment on February 21,
12  2008. On that date, at approximately 6:50 a.m., seven FBI Agents converged in "stack" formation
13  outside the front door of the apartment wearing protective vests with firearms unholstered and a door-
14  ram at the ready if needed. The agents knocked on the door of the apartment and announced their
15  presence. Defendant came to the door within 30 seconds wearing only his underwear which consisted
16  of boxer shorts and a T- shirt and appeared to have just awoken. Defendant was ordered to step out
17  of his residence and away from the doorway while agents swept into the apartment. Defendant was
18  detained outside his home by FBI Special Agent Todd Walbridge, the lead agent on this occasion, for
19  approximately eight minutes. During that time Agent Walbridge testified that he told Defendant that
20  the agents were there to search his residence, that he would explain more once they were in the
21  apartment and that he would be free to leave during the search. After the agents completed the
22  security sweep of Defendant's apartment and confirmed, among other things, that no one else was
23  present in the apartment, Defendant was escorted into his kitchen and instructed to sit at the kitchen
24  table. He was not permitted to enter his bedroom to secure clothing but he was provided with a pair
25  of pants and some socks. Defendant asked for water which was then brought to him.

26  FBI Agents Walbridge and Johnson proceeded to ask Defendant if he would talk to them about
27  their investigation. From the time Defendant had been detained outside his apartment until the agents
28  requested to speak with him Defendant had repeatedly asked what was happening, "what's this about."

1 Defendant agreed to speak with agents Walbridge and Johnson who then proceeded to interrogate
2 Defendant for approximately 70 minutes at the kitchen table while other agents searched the premises
3 and seized property. At the beginning of the interview, Agent Johnson activated a concealed
4 recording device and the entirety of the interview was recorded. Neither the recording nor transcript
5 of the interview indicates that Defendant was ever provided with his Miranda advisements or informed
6 he was free to leave.

7 It is undisputed that Miranda warnings were never administered to Defendant. The record
8 clearly demonstrates that Defendant was interrogated by two exceptionally well trained and
9 experienced agents with substantial knowledge concerning computer science and technology,
10 including methods of gaining unauthorized computer access and inflicting damage to computer
11 systems. By the end of the interrogation, Defendant had given a complete confession to the activities
12 that would ultimately form the charge in this case. The agents even succeeded in extracting from
13 Defendant his own suggestion as to what would be a fair and just punishment for his crime.

14 A review of the recording, and its transcription, reveals that Defendant repeatedly brought up
15 the subject of speaking with an attorney or having an attorney present. In this regard, some of
16 Defendant's statements were: (1) In response to statements by Agent Walbridge that any lie could
17 result in criminal charges, Defendant asked whether he should have a lawyer. Agent Walbridge
18 responded that he was not under arrest, the agents are just serving a search warrant, and that he was
19 seeking from Defendant to discover "what happened" and the "human side" to the events. (TR at
20 p.22: 4-19). (2) Upon further questioning regarding the computer hack and theft of trade secrets,
21 Defendant responded that he was scared and thought he "should talk to somebody," presumably an
22 attorney. (TR at p.23:3-18). (3) When asked if he was the individual who defaced the Miraval
23 website, Defendant responded "I'm afraid I should talk to a lawyer, have a lawyer." (TR at p.24:3-
24 23). The Agents responded that most people don't have an attorney, he's not being arrested, and
25 whether or not Defendant has an attorney is up to him. (TR at p.23:20-23).

26 On the factual issue of whether Defendant was advised at any time that he was free to leave
27 his apartment, the proceedings disclose the following: Agent Walbridge testified that he initially
28 informed Defendant that he was free to leave when Defendant was standing outside his apartment in

1  only his underwear, in the presence of armed FBI agents.  Agent Walbridge, in explaining why he did
2  not include in his Form 302 report that he had advised Defendant that he was free to leave, stated that
3  he did not include such information because the "recording accurately portray[ed] everything that []
4  happened that day]."  (RT at p.22:6-7).  At no time during what Agent Walbridge characterized as a
5  two hour interview (the actual interrogation lasted about 70 minutes) did the agents tell Defendant he
6  was free to leave.[1]

7  With this factual backdrop, the importance of the question of whether Defendant was in
8  custody at the time of his interrogation becomes readily apparent.  Indeed resolution of this issue
9  determines whether Defendant's statements may be used against him at the time of trial or whether
10 the statements must be suppressed as a consequence of a Miranda violation.

## DISCUSSION

12 Defendant contends that he was in custody for Miranda purposes when the agents interviewed
13 him.[2]  An individual is in custody for Miranda purposes when the suspect has been "deprived of his
14 freedom of action in any significant way."  United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir.
15 2008) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  Such a deprivation occurs when the
16 "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'"  Berkemer v.
17 McCarty, 468 U.S. 420, 440 (1984) (citation omitted).  The analysis of the circumstances of the
18 deprivation "is an objective one; [the court asks] whether 'a reasonable [person] in the suspects's
19 position would have understood his situation . . . as the functional equivalent of formal arrest.'"  United
20 States v. Revels, 510 F.3d 1269, 1273 (10th Cir. 2007) (quoting Berkemer, 468 U.S. at 442).  "Whether
21 a suspect is in custody turns on whether there is a 'formal arrest or restraint on freedom movement of
22 the degree associated with a formal arrest.' [Citations omitted].  This inquiry requires a court "to
23 examine the totality of the circumstances from the perspective of a reasonable person in the suspect's
24 position."  United States v. Crawford, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc).

25 In Craighead the Ninth Circuit adopted the "approach of using the 'police-dominated

---

[1] During the interview, Defendant made a complete confession.

[2] The parties do not dispute that Defendant was subject to interrogation by law enforcement agents for purposes Miranda.

1  atmosphere' as the benchmark for custodial interrogation in locations outside of the police station
2  [finding that it] is consistent with the Supreme Court's adaptions of <u>Miranda</u> to these types of
3  locations." <u>Id.</u> at 1083.  In <u>Craighead</u>, eight law enforcement agents from three different agencies
4  went to the defendant's home to execute a search warrant for child pornography on Craighead's
5  computer systems. At least five agents wore flak jackets, some had unholstered their weapons, and
6  others were armed. SA Andrews requested to talk with Craighead and stated that he was free to leave,
7  he was not under arrest, would not be arrested that day, and that any statement he would make would
8  be voluntary. Two agents and Craighead then went to a small, cluttered back room. The defendant
9  was not handcuffed. SA Andrews testified that it was her practice to tell interviewees that they were
10 free to leave once when escorted to an interrogation location and again at the beginning of the
11 interview. She did not specifically recall advising defendant a second time that he was "free to leave."

12     Craighead testified that he did not feel free to leave. In order to exit the small back room he
13 would have had to ask the detective to move in order to leave the room. He also testified that "the
14 prevailing mood of the morning" left him with the impression that he was not free to leave. He also
15 thought that even if SA Andrews had permitted him to leave the other officers would not have let him
16 leave. He did not know if he needed permission from all three law enforcement agencies executing
17 the search warrant before he was allowed to leave. During the interview, Craighead made a
18 confession to downloading child pornography. He moved to suppress the statements made to SA
19 Andrews based upon the failure of SA Andrews to provide him with his <u>Miranda</u> advisements. The
20 district court denied the motion to suppress, finding that the interview was not custodial.

21     The Ninth Circuit reversed. The Ninth Circuit reasoned that a search of one's home presents
22 analytical challenges in light of the "uniqueness of an interrogation conducted within the suspect's
23 home." <u>Craighead</u>, 539 F.3d at 1083; <u>Wayne v. Layne</u>, 526 U.S. 603, 610 (1999) ("The Fourth
24 Amendment embodies this centuries-old principle of respect for the privacy of the home"); <u>Mincey</u>
25 <u>v. Arizona</u>, 437 U.S. 385, 393 ("[T]he Fourth Amendment reflects the view of those who wrote the
26 Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the
27 name of maximum simplicity in enforcement of the criminal law"); <u>Payton v. New York</u>, 445 U.S.
28 573, 601 (1984) (the Fourth Amendment stresses "the overriding respect for the sanctity of the home

that has been embedded in our traditions since the origins of the Republic"). The analysis by the Ninth Circuit focused on the application of "the traditional Miranda inquiry to an in-home interrogation." Craighead, 539 F.3d at 1083. Noting that Miranda instructs that its advisements are to be provided when a suspect is held incommunicado "in a police-dominated atmosphere," Miranda, 384 U.S. at 445, the Ninth Circuit adopted and applied a four factor test to assist the court in determining whether the police created a police-dominated environment such that the suspect could not reasonably believe he was free to leave. In making this fact intensive inquiry, the district court is to consider all relevant factors including "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview and the context in which any such statements were made." Id. at 1084.

Applying the four factor test, the Ninth Circuit concluded that Craighead was in custody for purposes of Miranda. Accordingly, the failure of law enforcement to provide the Miranda advisements, or to communicate effectively that the suspect was "free to leave," required suppression of Craighead's statements. In applying the first factor, the Ninth Circuit noted that "the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere." Id. at 1085. The fact that eight armed agents arrived at Craighead's home to execute the search warrant satisfied this factor. Second, the totality of the circumstances (the presence of the agents, Craighead being escorted to a back room for the interview with the door closed, an agent standing by the door, and Craighead's belief that he was under guard) indicated that it was objectively reasonable for Craighead to believe that his "freedom of action was restrained in a way that increased the likelihood that [he] would succumb to police pressure to incriminate himself." Id. at 1086. Third, "isolating the suspect from family and friends is one of the distinguishing features of a custodial interrogation." Id. at 1087. The record indicated that Craighead was also isolated from other law enforcement personnel during the interview. The FBI excluded one government agent from the interview site. The Ninth Circuit noted that the "FBI may exclude whomever it chooses from an interrogation; Miranda requires that if the FBI isolates the suspect, and

the suspect does not reasonably believe he is free to leave, warnings must be given." Id. at 1087. Fourth, Craighead was told that he was not under arrest, he would not be arrested that day regardless of what information he provided, his statements were voluntary and he was free to leave. Despite the representations that he was free to leave, the Ninth Circuit, viewing the totality of the circumstances, concluded that "a reasonable person in Craighead's position would not have actually 'felt' he was free to leave." Id. at 1089.

Turning to the four-factor test identified in Craighead, the court grants Defendant's motion to suppress statements.

**First Factor - Presence of Law Enforcement**

In applying the first factor, the Ninth Circuit noted that "the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere." Id. at 1085. Here, seven FBI agents confronted Defendant with a search warrant at his home at 6:53 a.m. The FBI agents were armed, all wore flack jackets, and one agent held a battering ram. While five agents appeared at the front door, two other FBI agents initially stationed themselves near the back patio to ensure officer safety and to prevent potential escape. The officers initially had their weapons drawn but the weapons were holstered after completion of a security sweep. The court notes that strong and overwhelming police presence to execute the search warrant for the seizure of a laptop computer weighs more heavily then in instances where, for example, a search warrant issues for the seizure of weapons or other dangerous contraband. The court concludes that the overwhelming presence of the FBI agents would make a reasonable person in Defendant's position feel that his home was dominated by law enforcement agents.

**Second Factor - Restraint**

The court concludes that a reasonable person in Defendant's position would have felt restrained under the circumstances. Upon answering the door, Defendant was physically restrained while dressed only in boxer shorts and a T shirt. After about eight minutes, Defendant was permitted to reenter the home. While Defendant was not handcuffed, even upon reentry of his home his freedom of movement was restrained. He was not permitted to retrieve clothes (the agents retrieved a pair of pants and socks for Defendant) or to make a telephone call as the agents had seized his telephone.

1  Furthermore, the presence of seven FBI agents in and about Defendant's relatively small apartment
2  tended to create a police-dominated environment because "the facts belie any conclusion that [the
3  suspect's] home, on the morning of the questioning at issue, was the traditional comfortable
4  environment that we normally would consider a neutral location for questioning." United States v.
5  Revels, 510 F.3d 1269, 1275 (10th Cir. 2007).

6  The Government argues that Defendant was not handcuffed, he was advised that he was not
7  under arrest nor would he be arrested that day, and that he was advised he was free to leave. Further,
8  the Government argues that Defendant was interviewed at his kitchen table, unlike the case in
9  Craighead where the defendant was interviewed in a small back room. The court concludes that these
10 circumstances do not significantly undermine the court's finding that Defendant was subject to
11 significant and substantial restraint. While Defendant was interviewed at the kitchen table, the agents
12 told him where to sit for the interview. Further, the only time he was told he was free to leave
13 occurred when Defendant was standing semi-naked outside his apartment surrounded by armed FBI
14 agents who initially had their weapons unholstered. To inform an individual at that point in time that
15 he is free to leave is nearly meaningless. The only credible place of refuge for Defendant at that point
16 in time was to retreat into his home - - Defendant was dressed only in his underwear and lacked shoes,
17 identification, money, cell phone, and car keys. Even then, upon entry of his home, Defendant was
18 surrounded by FBI agents in a small apartment. The court concludes that a reasonable person under
19 the circumstances would have believed that his freedom of movement was restrained by the FBI
20 agent's presence and conduct.

**Third Factor - Isolation**

23 This factor favors a finding that the interview occurred under a police-dominated environment.
24 As in Craighead, the interview occurred in isolation as Defendant was home by himself and isolated
25 from others. The Government contends that Defendant "at no time expressed any desire to leave,
26 terminate the interview or call anyone." (Response at p.8:14-15). The record undermines this
27 assertion as the transcript from the interview reveals that Defendant expressed interest in talking to
28 an attorney on at least three separate occasions. The record also demonstrates that each time Defendant

1  raised the subject of an attorney, the agents stated or implied that an attorney would not be necessary
2  because the agents had no intention of arresting Defendant that day.[3] Thus, by deflecting the subject
3  of an attorney, the agents presumably believed they were able to continue on with their examination
4  unfettered by any concern about administering the Miranda advisements to Defendant. Further,
5  Defendant did not have access to a telephone as the FBI agents had seized his cell phone (the only
6  telephone in the apartment) and therefore he could not have made a telephone call.. Finally, at no time
7  during the interrogation was Defendant advised he could leave or terminate the interrogation.

**Fourth Factor - Free To Leave**

Of the four factors, this is probably the most important factor because the Supreme Court instructs that an individual is in custody for purposes of Miranda when the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" Berkemer, 468 U.S. at 440. An individual who may freely disengage from the presence of law enforcement personnel has not been "deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. When the questioning takes place in the home, these principles must be applied through the lens of Craighead's four part test.

Here, the Government argues that Defendant was free to leave because he "was advised that he was not under arrest, was not going to be arrested that day, that he was free to leave and did not have to answer questions." (Response at p.8:20-21). Agent Walbridge provided testimony on his interactions with Defendant. Agent Walbridge testified that he told Defendant that he was free to leave when Defendant was temporarily detained outside his apartment while other agents conducted a safety sweep of the home. When asked how many times Defendant was advised that he was free to leave, Agent Walbridge responded:

> A: Outside once, and then during the interview I - - approximately six times myself or Travis Johnson confirmed that he was not under arrest, and at least two times that his cooperation - - whether he wanted to speak to us was up to him, his cooperation would be appreciated.

---

[3] Agent Walbridge testified that he and Agent Johnson told Defendant on six separate occasions that he was not under arrest. (RT 22:12-13).

(TR at p.22:11-15). In other words, Agent Walbridge informed Defendant only once that he was free to leave and that occurred while he was detained in his underwear outside his apartment in the presence of armed FBI agents. As set forth above, such an advisement at that point in time rings hollow. Any reasonable person whose sole immediate material possessions consist of a T shirt and boxers is not likely to feel free to walk away from seven armed FBI agents at 7:00 a.m. Even if one felt free to leave, the only likely refuge available to Defendant would be to retreat into his home, accompanied by seven FBI agents who would not let him roam freely within his home. Defendant could not reasonably have left his home. There was simply no other place for Defendant to go. Moreover, at that point in time, Defendant was still under the initial heightened emotional impact of having encountered armed FBI agents outside his home. Rather than inform Defendant that he was free to leave at some point in time after he reentered his home, the agents remained silent in that they did not effectively communicate to Defendant, in a manner which would allow a minimal degree of reflective contemplation, that he was free to leave. Rather, the agents employed skillful interrogation techniques to extract a complete confession.

Even though the evidentiary record establishes that Defendant was informed on a single occasion that he was free to leave, the totality of the circumstances establish that a reasonable person would not have felt free to leave for the reasons previously discussed. The fact that Defendant was told on several occasions that he would not be arrested that day and that his cooperation would be voluntary and appreciated does not undermine this court's determination that Defendant was not adequately informed that he was free to leave. To the contrary, any time Defendant expressed concern about whether he should confer with counsel, rather than informing Defendant he was free to leave or terminate the interview, the agents pressed their strategy of emphasizing how important Defendant's cooperation would be when the time came to decide whether criminal prosecution or civil litigation would be pursued.[4] In effect, the record discloses that the agents, as their training and experiences no doubt dictated, enticed the Defendant to stay, rather than leave, with their suggestions that his continued honesty would be favorably viewed.

---

[4] For example, the agents explained to Defendant that he could become a felon if he lied to them, (TR at p. 22:4-10), and that the prosecutor could decide that the case should proceed as a civil action, and not as a criminal one. (TR at p. 66:12-18).

1    In sum, the court concludes that the first three factors strongly favor a finding of a police-
2 dominated atmosphere and that the fourth factor favors the Defendant, if anyone.  Accordingly, the
3 court concludes that Defendant was in custody for purposes of <u>Miranda</u> at the time of his interview.
4 The statements made therein are hereby suppressed.

5    **IT IS SO ORDERED.**

6 DATED:  March 9, 2009

 _____
 Hon. Jeffrey T. Miller
 United States District Judge

8 cc:   All parties